IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JACQUELINE ELLINGTON o/b/o    )
C.S., III,    )
    )
    Plaintiff,    )
    )
    v.    )    CIVIL ACTION NO. 2:07cv789-CSC
    )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff Jacqueline Ellington filed this lawsuit on behalf of her son, C.S., III ("C.S.")[1],

to review a final judgment by defendant Michael J. Astrue, Commissioner of Social Security,

in which he determined that C.S. is not "disabled" and therefore, not entitled to supplemental

security income benefits.  Her application was denied at the initial administrative level.  The

plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").

Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a

subsequent request for review.  The ALJ's decision consequently became the final decision of

the Commissioner.[2]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The parties

---

[1]  Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, and M.D. Ala. General Order No. 2:04mc3228, the court has redacted the plaintiff's minor child's name throughout this opinion and refers to him only by his initials, C.S.

[2]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

have consented to the undersigned United States Magistrate Judge rendering a final judgment in this lawsuit pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1. The court has jurisdiction over this lawsuit pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the court concludes that the Commissioner's decision denying C.S. supplemental security income benefits should be reversed and remanded for further proceedings.

## II.  STANDARD OF REVIEW

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 includes the standard for defining child disability under the Social Security Act. *See* Pub. L. No. 104-193, 110 Stat. 2105, 2188 (1996). The statute provides that an individual under 18 shall be considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I) (1999). The sequential analysis for determining whether a child claimant is disabled is as follows:

1.  If the claimant is engaged in substantial gainful activity, he is not disabled.

2.  If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment. If the claimant's impairment is not severe, he is not disabled.

3.  If the impairment is severe, the Commissioner determines whether the impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies this requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments are not medically equal, or functionally equivalent in severity to a listed impairment, the child is not disabled. *See* 20 C.F.R. § 416.924(d)(2) (1997). In reviewing the Commissioner's decision, the court asks only whether his findings concerning the steps are supported by substantial evidence. *See Brown v. Callahan*, 120 F.3d 1133 (10th Cir. 1997).

## III.  STATEMENT OF THE ISSUES

The first issue, as stated by the plaintiff, is whether "[t]he Commissioner's decision should be reversed by failing to find that the combination of CS's Attention Deficit Hyperactivity Disorder, Psychotic Disorder, and Intermittent Explosive Disorder rose to listing level severity." (Pl's Br., doc. # 13, at 11).  The second issue, also as stated by the plaintiff, is whether "[t]he Commissioner's decision should be reversed, because the ALJ's functionally findings lack the support of substantial evidence." (*Id.*)  Finally, the plaintiff argues that "[t]he Commissioner's decision should be reversed, because the ALJ failed to issue a credibility finding in compliance with the law of the Eleventh Circuit." (*Id.*)

The plaintiff's issues and arguments relate to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the ALJ erred as a matter of law, and thus, this case is due to be remanded for further proceedings.

## IV.  DISCUSSION

## A.  Procedural History

The ALJ, in his opinion, followed the regulations' three steps as listed above when he analyzed C.S.'s claim.  After doing so, he concluded that C.S. is not disabled and, therefore denied his claim for supplemental security income benefits.  Under the first step, the ALJ found that C.S. is not engaged in substantial gainful activity.  At the second step, the ALJ found that C.S. has severe impairments of attention deficit hyperactivity disorder (ADHD), Combined Type, Psychotic Disorder, NOS, and Intermittent Explosive Disorder.  (R. 15). Next, at step three, the ALJ found that C.S. did not have an impairment, individually or in combination, that meets or medically equals any of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  In so finding, the ALJ did not refer to or discuss any listing, including  Listing 112.03, Schizophrenic, Delusional (Paranoid), Schizoaffective, and Other Psychotic Disorders, Listing 112.08, Personality Disorders or Listing 112.11, Attention Deficit Hyperactivity Disorder.  Nonetheless, the ALJ concluded that C.S.'s "does not have an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning."[3]  (R. 22). Consequently, the ALJ concluded that C.S. is not disabled.

## B.  Medical Evidence

---

[3] In order to functionally equal a listing, C.S.'s impairments must result in "marked" limitations in two or more functional domains or "extreme" limitation in one functional domain.  20 C.F.R. § 416.926a(a).  The ALJ was required to consider six areas of development: Acquiring and using information; Attending and completing tasks; Interacting and relating to others; Moving about and manipulating objects; Caring for yourself; and Health and physical well-being.  (*Id*. at 416.926a(b)).

After a hearing, the ALJ concluded that C.S. suffers from severe impairments of ADHD, Psychotic Disorder, and Intermittent Explosive Disorder. (R. 15) However, the ALJ concluded that C.S. has "no limitation" in the domains of acquiring and using information, interacting and relating to others, and moving about and manipulating objects. (R. 20-21). In addition, the ALJ found that C.S. has "less than marked" limitation in the domains of attending and completing tasks, caring for himself and health and physical well-being. (R. 21-22).

C.S. was 7 years old at the time of the hearing, (R. 225), and was repeating the first grade. (R. 234). He is currently enrolled in his third school due to his disruptive behavior. (R. 237). He punched a student in the nose hard enough to cause the nose to bleed. (R. 231). His mother testified that C.S. stabbed his sister in the neck with a steak knife. (R. 233-34). She further testified that C.S. has gotten in trouble at school for kicking, pushing, and hitting other students as well as throwing temper tantrums. (R. 236). He has run away from school and banged his head on a tape recorder until the tape recorder broke. (R. 236-37). She testified that C.S. gets frustrated, angry and distracted; he has difficulty staying focused and on task. (R. 238). Finally, she testified that C.S. takes Tegretol and Risperdal every day – "to keep him from hearing voices, and the other one is to basically make him be able to control himself." (R. 233).

The plaintiff applied for disability benefits for C.S. on February 14, 2005 alleging in part that he throws temper tantrums, breaks things, throws things, "falls out," hollers and kicks. (R. 44-51).

On November 4, 2004, C.S. presented to his primary care physician. (R. 155). His

5

mother complained that he was holding his breath and he "is mean." He "tries to hurt other people when he is upset." (*Id.*) As a result on these behavorial problems, C.S. was referred for an EEG. (R. 151). On November 9, 2004, an EEG was conducted to rule out seizures. (R. 153). The clinical history noted that C.S. was 5 years old with "[s]evere behavorial (sic) problems and aggression." (*Id.*) The EEG revealed no epileptiform discharges. (*Id.*).

On November 29, 2004, C.S. presented to his primary care physician with a cold. His mother reported that he was hyperactive and out of control. He also chased his sister with a knife. (R. 154). He was diagnosed with behavioral problems and attention deficit hyperactivity disorder. C.S. was started on Adderall and referred to Behavioral Medicine for evaluation and psychotherapy. (*Id.*).

On December 17, 2004, C.S. was evaluated at Behavioral Medicine "for medication adjustment and possible mental retardation." (R. 172). It was noted that C.S. had recently been diagnosed with ADHD due to disruptive behavior. His mother reported that C.S. "has had significant difficulty with . . . temper tantrums, destructive aggressive behavior, impulsivity, head banging, and some at-risk behavior." (*Id.*)

During the evaluation, C.S. "was cooperative, but appeared busy and hyperactive. His behavior was distracted and curious." (R. 173). Dr. DeMuth confirmed the diagnosis of ADHD and prescribed Risperdal[4] and psychotherapy. (R. 174).

On December 31, 2004, Behavioral Medicine's treatment notes indicate "some

---

[4] Risperdal is an antipsychotic medication used to treat "certain mental/mood disorders (schizophrenia, manic phase of bipolar disorder, irritability associated with autistic disorder." *See* http://fdb.rxlist.com/drugs/drug-9846-Risperdal+Oral.aspx?drugid=9846&drugname=Risperdal+Oral

improvement." (R. 170). On January 28, 2005, C.S.'s mother reported "some improvement" and a decrease in C.S.'s anger. (R. 169). On February 25, 2005, C.S.'s mother reported that C.S. continued to have rages. (R. 208). Risperdal was prescribed. (*Id*.).

On April 8, 2005, C.S. was exhibiting an increase in problems including aggression, violence and hyperactivity. (*Id*.). He was noted to be psychotic, and his Risperdal medication was increased. (*Id*.).

On June 2, 2005, C.S.'s mother reported an increase in problems when C.S. was not medicated. He was prescribed Risperdal. (R. 207). On June 30, 2005, treatment notes indicate "some improvement," but C.S. was still psychotic. (*Id*.) His Risperdal was increased. (*Id*.)

On June 9, 2005, C.S. was seen by his primary care physician who noted that C.S. was taking Risperdal for behavioral problems. (R. 182).

On June 30, 2005, Dr. Majure, C.S.'s therapist at Behavioral Medicine, noted some improvement but indicated C.S. was still psychotic. (R. 207). Dr. Majure increased C.S.'s Risperdal. (*Id*.). On July 29, 2005, C.S.'s father reported that C.S. was stable; Dr. Majure noted that he was psychotic. (*Id*.).

On August 25, 2005, C.S. was seen at Behavioral Medicine because of disruptive and violent behavior at school. (R. 206). Metadate was added to C.S.'s prescription regime.[5] (*Id*.).

---

[5] Although Metadate is used to treat ADHD, it advises caution when administering to "emotionally unstable patients." *See* http://fdb.rxlist.com/drugs/drug-20820-METADATE+CD+Oral.aspx?drugid=20820& drugname=METADATE+CD+Oral

On September 8, 2005, C.S.'s mother reported an increase in aggression problems since C.S. was given Metadate. C.S.'s Metadate prescription was decreased while a prescription for Abilify was added.[6] (*Id*.). On September 15, 2005, C.S.'s Abilify prescription was increased. (*Id*.). Dr. Majure, a licensed clinical psychologist, also wrote a letter indicating that C.S. was receiving treatment for ADHD, Combined Type, Psychotic Disorder, NOS, and Intermittent Explosive Disorder. (R. 131). In addition, Dr. Majure noted that C.S.'s "medication regime has not been effective as of this date. New medications are being tried." (*Id*.) Lithium and Risperdal were noted. (*Id*.)

On September 29, 2005, C.S.'s father reported an increase in C.S.'s temper and aggression. (R. 205). C.S.'s Abilify prescription was increased. (*Id*.). On October 6, 2005, treatment notes indicate "continued problems [with] anger, violence, believes others are talking about [him], threw desks, psychotic." (*Id*.). C.S. was prescribed Tegretol and Risperdal. On November 4, 2005, C.S.'s grandmother and father reported that C.S. continued to exhibit symptoms. (*Id*.).

On May 4, 2006, C.S. was seen by his primary care physician for sores on his arms and legs. At that time, his mother requested a prescription for C.S.'s ADHD medication. (R. 212).

On October 30, 2006, C.S. was seen by his primary care physician requesting a referral to Behavioral Medicine for treatment of ADHD and other behavior problems, including schizophrenia. (R. 210).

---

[6] Abilify is "used to treat certain mental/mood disorders (e.g., bipolar disorder, schizophrenia)." http://fdb.rxlist.com/drugs/drug-64439-Abilify+Oral.aspx?drugid=64439&drugname=Abilify+Oral. It is an antipsychotic drug. *Id*.

On December 7, 2006, C.S. presented to Behavioral Medicine for psychotherapy. His mother reported a number of problems related to aggression. (R. 197).

On December 11, 2006, C.S. was seen at Jackson Hospital Emergency Room for a possible seizure. (R. 186). Treatment notes indicate that C.S. was recently diagnosed as suffering from schizophrenia, (R. 192, 194), and "[w]as recently placed on medication for schizophrenia and hyperactivity." (R. 186.). C.S. was on Risperdal and Tegretol. (R. 189-90). C.S. was diagnosed as suffering from an adverse drug reaction and directed to discontinue medication until seen by his therapist. (R. 189-91).

On December 12, 2006, C.S. was seen at Behavioral Medicine and his medications of Tegretol and Risperdal were restarted. (R. 197).

On January 26, 2007, C.S.'s grandmother reported that C.S.'s symptoms were stable. (R. 196). However, treatment notes from Behavioral Medicine indicate that C.S. was psychotic. (*Id*.). He was continued on Tegretol and Risperdal. (*Id*.).

### C. Evidence of Behavioral Problems at School

C.S. began attending school at T.S. Morris Elementary School but was transferred to Highland Gardens Elementary School due to behavioral problems. (R. 90). When C.S. was in the first grade, the Montgomery Public School system referred him for evaluation due "[b]ehavior issues [which] included: hitting, flipping over table, running out of classrooms and the building when frustrated and violent temper tantrums." (R. 91). At the time of the evaluation, C.S. was taking Lithium and Risperdal for ADHD, Psychotic Disorder, and Intermittent Explosive Disorder. (*Id*.). Testing indicated that C.S. cognitive abilities were in

the low average range.  Consequently, he did not qualify for special education services.  (R. 101).

On March 18, 2005, C.S.'s kindergarten teacher completed a teacher questionnaire.  (R. 64-76).  She noted that C.S. had an obvious problem waiting his turn, changing activities without being disruptive, and working without distraction.  (R. 69).  He had a number of problems daily attending and completing tasks.  (*Id*.)  He also had an obvious problem daily of interacting and relating to others.  (R. 70).  Specifically, he struggled with playing cooperatively with others, making and keeping friends, seeking attention and expressing anger appropriately and following rules.  (*Id*.).  Finally, he had an obvious problem caring for himself in that he did not handle frustration appropriately nor was he patient.  (R. 73).  C.S. had no problem moving about or manipulating objects.  (R. 72).  Her added comments were compelling.

> [C.S] takes away from the learning climate in my classroom.  He does not listen at all!  He is constantly hitting, punching, kicking, and slapping other children.  His behavior is very disruptive.  [C.S.] has to sit isolated from the rest of the children.  Sometimes medication does not seem to help!

(R. 75).

The school's discipline log for the 2005-2006 school year indicates that C.S. had difficulty from the beginning of school.  On August 15, 2005, he fell on the floor, and kicked chairs and students.  (R. 143).  On August 16, 2005, C.S. "ran out of the classroom, kicking the walls in the hallway, falling on the floor, crying."  (*Id*.).  On August 17, 2005, C.S. left his classroom and fell on the floor kicking and screaming in the hallway.  (*Id*.).  On August 18, 2005, C.S. kicked chairs and desks in the classroom.  (*Id*.).  On August 19, 2005, C.S. threw

a chair. (R. 142). On August 22, 2005, C.S. punched a student in the nose hard enough to cause the child's nose to bleed. (*Id*.). In September, C.S. "threw chairs around the room, and he picked up a desk and threw it at [a female student]. [H]e also walked over and pushed [a male student.]" (*Id*.) As a result of this incident, a parent-teacher conference was held on September 6, 2005, and C.S. was scheduled for behavioral counseling. (R. 144).

On January 5, 2007, C.S.'s first-grade teacher at the alternative school completed a teacher questionnaire for the period of October 2005 to May 2006. (R. 125-127). According to this teacher, "[C.S.] interacted with [her] fine. [She] did have behavior problems when he decided he was ready to go home." (R. 125). She noted that C.S. "would have sudden violent outbursts in class" and "was suddenly aggressive with his classmates. He liked to make them afraid of him." (R. 126). This teacher believed that C.S. " wanted to stay home at home because he was afraid his parents might die. He learned that if he behaved badly or ran out of the school building he would be suspended and get to stay home." (*Id*.). She does not delineate the basis for her beliefs about C.S.'s behavior.[7]

## D.  Legal Analysis

The court has an obligation to scrutinize the record in its entirety to determine the reasonableness of the ALJ's decision. *See Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987). The ALJ must consider every impairment alleged by the plaintiff and determine

---

[7]  According to the teacher, C.S.'s bad behavior stemmed from his reaction to his father's death. However, other than this teacher's cryptic note that C.S. "was going through grief from his father's death during the time span I taught him," (R. 126), there is no other indication that his father died. Moreover, assuming that his father did pass away, the record clearly demonstrate that C.S. experienced behavioral problems while his father was alive. (R. 205, 207).

whether the alleged impairments are sufficiently severe - either singularly or in combination - to create a disability. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986). All of the plaintiff's impairments must be considered in combination even when the impairments considered separately are not severe. *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985). The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981). For the reasons that follow, the court concludes that the Commissioner's decision is not supported by substantial evidence and is due to be remanded for further proceedings.

### 1. Failure to consider the Listings.

> Social Security regulations provide a three-step sequential analysis for determining whether a child is disabled. 20 C.F.R. § 416.924(a). First, the Commissioner must determine whether the child is engaged in substantial gainful activity. *Id.* If yes, the child is not disabled, but if not, the Commissioner must then proceed to the second question, which is whether the claimant has a severe impairment. *Id.* If not, the child is not disabled. *Id.* If yes, *the Commissioner then must consider the third step, whether the child has an impairment that meets, medically equally, or functionally equals the Listing of impairments. Id.* If the child satisfied a listing, the child is conclusively disabled. *Id.*

*Gibbs v. Barnhart*, 130 Fed. Appx. 426, 428-29 (11th Cir. 2005) (emphasis added); *Henry v. Barnhart*, 156 Fed. Appx. 171, 173 (11th Cir. 2005) (emphasis added).

The ALJ concluded that C.S. has not engaged in substantial gainful activity, and that he has severe impairments. (R. 15). C.S. has been diagnosed with and treated for ADHD, Psychotic Disorder, and Intermittent Explosive Disorder. (R. 131). In addition, there are references in the record that indicate that C.S. has also been diagnosed with schizophrenia.

Step three requires a three-tiered approach to determining whether the child has an impairment that meets, medically equals, or functionally equals the Listing of impairments. First, the ALJ must consider whether C.S. *meets* a Listing. 20 C.F.R. § 416.924(a); *Johnson*, 148 Fed. Appx. at 840. "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). Next, the ALJ must consider whether C.S.'s impairments *medically equal* the Listings. 20 C.F.R. § 416.924(a). To medically equal a listing, there must be in the record "medical findings that are at least equal in severity and duration." *Johnson*, 148 Fed. Appx. at 841-42. Finally, if the ALJ concludes that C.S. does not meet or medically equal a Listing, the ALJ must determine whether C.S. *functionally equals* a Listing by considering the six domains of functional limitations set forth in the regulations. *See Henry*, 156 Fed. Appx. at 173-74.

The required level of severity for Listing 112.11, Attention Deficit Hyperactivity Disorder, is met when there is a medically documented finding of marked inattention, impulsiveness and hyperactivity coupled with a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.11. Although the ALJ recognized that C.S. suffers from ADHD, the ALJ failed to properly consider whether he meets, medically equals or functionally equals this Listing.

The required level of severity for Listing 112.03, Schizophrenic, Delusional (Paranoid),

Schizoaffective, and Other Psychotic Disorders, is met when there is medically documented persistence, for at least six months, of delusions or hallucinations or catatonic, bizarre, "other grossly disorganized behavior," or incoherent, illogical thinking, or loosening of association, or poverty of speech content, or flat, blunt or inappropriate affect, or emotional isolation, apathy, or withdrawal, resulting in a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.03. On October 6, 2005, Dr. Majure at Behavioral Medicine notes that C.S.'s father reports that C.S. has "continued problems [with] anger, violence, **believes others are talking about [him]**." (R. 205) (emphasis added). Dr. Majure prescribed Tegretol in addition to Risperdal. (*Id*.). Although there are several references in the medical evidence that C.S. has recently been diagnosed with schizophrenia, (R. 186, 192, 194, 210), the ALJ does not consider whether C.S. meets, medically equals or functionally equals this Listing.

The required level of severity for Listing 112.08, Personality Disorders, is met when there is "[d]eeply ingrained, maladaptive patterns of behavior, associated" with seclusiveness or autistic thinking, pathologically inappropriate suspiciousness or hostility, oddities of thought, perception, speech, and behavior, persistent disturbances of mood or affect, pathological dependence, passivity, or aggressiveness, or intense and unstable interpersonal relationships with impulsive and exploitative behavior resulting in a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404,

14

Subpt. P App. 1, Listing 112.08. The plaintiff specifically asserts that C.S. exhibits "[i]ntense and unstable interpersonal relationships and impulsive and exploitative behavior." (*Id*. A6). The record is replete with references to C.S.'s anger, violence, temper and aggression. (R. 44-51, 75, 91, 125-26, 142-44, 155, 153, 154, 172, 182, 197, 205-06, 208, 231, 233-34, 236-38). Although the ALJ recognized that C.S. suffers from Psychotic Disorder and Intermittent Explosive Disorder, the ALJ failed to properly consider whether C.S. meets, medically equals or functionally equals this Listing.

Without reference to any particular Listing, the ALJ found that C.S.'s impairments do not meet or medically equal a listed impairment. He fails to give any explanation for this finding. Instead, the only explanation set out in the ALJ's opinion is a discussion of the six domains of functional limitations which must be considered in determining functional equivalence. It appears to the court that the ALJ conflated the analysis which must be made in step three; that is not proper. *See e.g. Shinn ex rel Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (Discussion showing that the "meet," "medically equal," and "functionally equivalent" inquiries are distinct.). Step three's three-tiered approach requires the ALJ to evaluate each tier individually to determine whether C.S. *meets, medically equals, or functionally equals* the Listings. This the ALJ failed to do.[8] Consequently, the court cannot

---

[8]In reaching this conclusion, the court is aware that several -- but not all -- of the listed impairments require that a child exhibit marked impairment in two or extreme impairment in one of the listed domains. However, not all of the listings require this; thus, in the absence of the ALJ stating which listings he considered, the court cannot determine if the conflation of the third step into consideration of only the functional equivalence determination is correct in this case. Moreover, the problem is exacerbated by the ALJ's errors in considering the functional equivalence question.

determine whether the ALJ's determination that C.S. is not disabled is supported by substantial evidence.

Furthermore, even if the court were to determine that the ALJ properly completed the first two tiers of the step three analysis, i.e. whether C.S. met or equally the Listings, the court concludes that, at a minimum, the ALJ's analysis at the third tier of step three that C.S. does not "functionally equal" the Listings is flawed and not supported by substantial evidence.

By considering the six domains of functional limitations, the ALJ concluded that C.S. "does not have an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning." Specifically, the ALJ concluded that C.S. has "no limitation in interacting and relating with others." (R. 20). In reaching this conclusion, the ALJ relied on a teacher questionnaire from C.S.'s first grade teacher Debra Watkins. (*Id*). According to Ms. Watkins, C.S. acted out "when he wanted to go home." (R. 125). However, even Ms. Watkins acknowledged that C.S. "would have sudden violent outburst (sic) in class. . . . H was suddenly aggressive with his classmates. He liked to make them afraid of him." (R. 126). In addition, the record is replete with other references to C.S.'s inability to get along with other students. C.S.'s kindergarten teacher, Angie Cooper, reported that

> [C.S] takes away from the learning climate in my classroom. He does not listen at all! **He is constantly hitting, punching, kicking and slapping other children.** His behavior is very disruptive. [C.S.] has to sit isolated from the rest of the children.

(R. 75) (emphasis added). During the first two weeks of school, C.S. threw a desk at a female

student, pushed a male student and punched another male student in the nose. (R. 142). He hit and kicked students. (R. 143-44). Despite this evidence that strongly suggests that C.S. has limitations[9] in his ability to interact with others, the ALJ astonishingly concluded that C.S. has "**no** limitation in interacting and relating with others." (R. 20) (emphasis added).

More importantly, an ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839, 840-841 (11th Cir. 1992). "Conflicts in the evidence . . . are to be resolved by the [Commissioner], not by the courts." *Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981) *citing Laffoon v. Califano*, 558 F.2d 253, 254-55 (5th Cir. 1977). *See also Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981) ("[T]he ALJ has primary responsibility for responsibility for resolving conflicts in the evidence."). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion over another. The ALJ must state, with sufficient specificity, the reasons for discounting C.S.'s school evidence regarding his ability to get along with and relate to others.[10] "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662

---

[9] It is not the function of the court initially to characterize the degree of impairment. That is for the ALJ after proper consideration of all the evidence.

[10] The court also notes that the ALJ failed to explain why he discredited C.S.'s mother's testimony that C.S. has temper tantrums, rage, destructive and aggressive behavior, and is uncontrollable.

F.2d 731, 735 (11th Cir. 1981).  "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985).  In order to fulfill his obligations, the ALJ must, at the very least, resolve the inconsistencies in the testimony, rather than selectively choosing items to support his decision. In sum, the court concludes that the ALJ failed to properly consider whether, at step three, C.S.'s impairments meet, medically equal or functionally equal the Listings, and thus, his conclusion that C.S. is not disabled is not supported by substantial evidence.

**2. Failure to properly weight the evidence from treating physicians.**  The law in this circuit is well-settled that the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician unless good cause exists for not doing so.  *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).  The Commissioner, as reflected in his regulations, also demonstrates a similar preference for the opinion of treating physicians.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR § 404.1527 (d)(2)).

It is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight.  *Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981).

The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). However, the ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

C.S. has been treated by a primary care physician and a psychotherapist since 2004. He has consistently been diagnosed with ADHD, Psychotic Disorder and Intermittent Explosive Disorder. He has recently been diagnosed as suffering from schizophrenia. He has been on antipsychotic medication for at least three years, since he was five years old.

While an ALJ is entitled to make reasonable evidentiary conclusions, in this instance, the ALJ does not explain why he chose to ignore salient portions of the treating physicians' records, particularly when that evidence reflects favorably on the plaintiff's claim. The ALJ notes that C.S. is treated by Behavioral Medicine, and "[s]ubsequent office notes reveal some improvement." (R. 16). The ALJ then ignores those office notes that report an increase in problems, aggression, violence, and temper. (R. 204-08). In addition, the ALJ ignores all reference to C.S.'s continued psychosis, and he makes no reference at all to C.S.'s diagnosis of schizophrenia. (*Id.*). It appears that the ALJ culled the record for selective references, ignoring comments that did not support his conclusions. For example, the ALJ cites Dr. Majure's letter that C.S. is receiving treatment, (R. 16), but then ignores the very next sentence in the letter.

> [C.S.] is currently receiving treatment at Behavioral Medicine of Montgomery. His diagnoses are ADHD, Combined Type, Pyschotic Disorder, NOS, and Intermittent Explosive Disorder. **His medication regime has not been**

**effective as of this date. New medications are being tried.**

(R. 131) (emphasis added).

In this case, the ALJ fails to discuss either C.S.'s primary care physician or his therapist's diagnoses or treatment records. In addition, the ALJ completely ignores evidence that C.S. has also been diagnosed as schizophrenic.

> The ALJ's opinion, thus, not only fails to mention the [plaintiff's] treating physician and the weight, if any, the ALJ gave to the treating physician's evidence and opinion, but also strongly suggests that the ALJ did not accord the opinion of the [plaintiff's] treating physician the weight required by law. At the very least, [the court is] unable to determine whether the ALJ applied the proper legal standard and gave the treating physician's evidence substantial or considerable weight or found good cause not to do so. If [the court is] to provide the parties with any sort of meaningful judicial review, we must be able to ascertain whether the ALJ correctly followed the law. Unable to divine this from the ALJ's opinion, we must review . . . and remand the case for reconsideration by the ALJ, who should evaluate all the evidence according to the respective weight required by law and should render a decision that will provide reviewing courts with the basis for determining that he applied the correct standards.

*Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982). Thus, the ALJ erred as a matter of law.

The court's main difficulty with the ALJ's determination is his sole reliance on the statements of C.S.'s first grade teacher while completely disregarding the evidence from his treating physicians. The ALJ's reliance is particularly egregious because the evidence presented by C.S.'s teacher is in direct conflict with *all other* evidence including the medical records. The court will not belabor the obvious. Suffice it to say, it borders on the ludicrous that the ALJ would conclude that C.S.'s impairments are "less than marked" by relying strictly

on the testimony of a non-medical person, particularly when there is contradictory medical evidence in the record.

An ALJ must clearly articulate the reasons for giving less than conclusive weight to the opinion of a treating physician, and the failure to do so is reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986). The ALJ clearly erred as a matter of law when he failed to consider the opinions of C.S.'s treating physicians. He compounded his error by relying on the opinion of a non-medical person to support his determination that C.S. is not disabled.[11]

## V. CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner with directions for further proceedings consistent with this opinion.

A separate order will issue.

Done this 18th day of April, 2008.

_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[11] The court also notes that the ALJ did not explain how he could substitute his judgment or the judgment of Ms. Watkins for the judgment of the medical professionals who treated C.S. and diagnosed the severity of C.S.'s psychological conditions. An ALJ is not free to substitute his judgment or the judgment of non-medical persons for that of professionals in the field.

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

   (b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

   *Rev.: 4/04*

2.   **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)   **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)   **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)   **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)   **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)   **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.   **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.   **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).